# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| ANTHONY J. OLIVER, | |
| *Plaintiff,* | |
| v. | CIVIL ACTION NO. **5:21-cv-00183-TES** |
| Warden LAWRENCE WHITTINGTON, *et al.,* | |
| *Defendants.* | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Anthony J. Oliver filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants Warden Lawrence Whittington, Captain Melissa Lawson, Officer Rick Deese, Officer Joseph Weaver, Officer Zachary Stanfield, and Officer Turner[1] were deliberately indifferent to Plaintiff's safety by failing to protect him from serious injury and sexual attacks by other prison inmates in violation of his rights

---

[1] Plaintiff incorrectly named Crystal Turner as a Defendant because her only "role was taking [Plaintiff] to the hospital." [Doc. 33-4, Oliver Depo. II, pp. 51:16–19]. Plaintiff testified that while he believes "a proper defendant . . . is Steven Turner," around "15 to 20 officers with the name Turner" worked at the prison. [*Id.* at p. 52:6–9]. The civil docket page lists "Officer Heather Turner," defense counsel noted in Plaintiff's deposition that "[i]t appears that Crystal Turner was the one who was identified and served," and Plaintiff refers to a "Jonathan Turner" in his Response to Defendants' Motion for Summary Judgment. [*Id.* at p. 51:23–24]; [Doc. 1-5]; [Doc. 36, pp. 3, 10]. In any event, Plaintiff hasn't added any other defendant since he filed his Complaint [Doc. 1], or otherwise corrected any mistake either party made during discovery regarding identifying and serving the correct "Turner." Accordingly, the Court **GRANTS** Summary Judgment as to Crystal Turner—the only named Defendant with the last name Turner.

secured by the U.S. and Georgia Constitutions.[2] [Doc. 1, pp. 8–11]. Specifically, Plaintiff alleges that Defendants knew he identified as a woman even though he is a man, assigned him to a general population cell with a "known sexual predator" anyway, failed to complete mandatory security checks on the night another inmate attacked him, falsified their signature on the log sheets, and then "tore up" a grievance Plaintiff filed about the assault. [*Id.* at pp. 3–11]. After discovery, Defendants filed a Motion for Summary Judgment. [Doc. 33]. Upon review of the record and applicable law, the Court **GRANTS** Defendants' Motion for the reasons stated below. [Doc. 33].

## FACTUAL BACKGROUND

Although born biologically male, Plaintiff later decided to identify as a female. [Doc. 33-4, Oliver Depo. II, pp. 7–8]. Plaintiff testified that he[3] spoke to prison staff members about his chosen gender identity upon arrival at Wilcox State Prison ("WSP") in August or September 2020. [*Id.* at pp. 8–9]. Specifically, Plaintiff first told an intake nurse at WSP that he was transgender, and "then [he] saw the PREA Coordinator, Karen Dunnigan," when he first arrived in "August or September of 2020."[4] [*Id.* at p.

---

[2] Plaintiff only sued Defendants in their individual capacities. [Doc. 1, ¶¶ 33–35].

[3] Plaintiff, his counsel, and counsel for Defendants have exclusively and, more importantly, accurately used masculine pronouns to refer to Plaintiff. In accordance with its practice to use factually correct terms, the Court does the same.

[4] Plaintiff testified that after he spoke with the intake nurse about being transgender, "the intake nurse was then required to inform Karen Dunnigan, the PREA Coordinator, 'cause it was [his] understanding that all the LGBT inmates were kept in one dorm at Wilcox State Prison, [although] they were not." [Doc. 33-4, Oliver Depo. II, p. 9:2–6].

2

8:15–22]. In addition to informing the intake nurse and PREA Coordinator, Plaintiff

identified himself as transgender with the GDC one other time—"initially, when [he]

was first turned over from the sheriff to GDC through Jackson State Prison." [*Id.* at p.

9:17–19].

Nothing in the record indicates that Plaintiff suffers from gender dysphoria.

Plaintiff readily admitted that he doesn't take any medications to assist him in changing

his gender, hasn't undergone hormone therapy, and hasn't otherwise taken any step to

start the gender-transformation process in any obvious way while incarcerated.[5] [Doc.

33-4, Oliver Depo. II, at pp. 7–8].

Plaintiff also claims that when he first arrived at WSP, he spoke with Warden

Whittington, who was taking over for the outgoing warden at the time. [*Id.* at pp. 35–

38]. Specifically, Plaintiff alleges he told Warden Whittington that he identified as a

woman and asked whether the prison had "a specific dorm for LGBTQ offenders."[6] [*Id.*

at p. 36:2–3]. Plaintiff testified that Warden Whittington responded, "no, I don't have

one because if I did that, it would create a problem if I put all the LGBTQ inmates in one

---

[5] During his deposition, Plaintiff testified that he saw two physicians in Florida around 2019 to discuss the gender-transformation process. [Doc. 33-4, Oliver Depo. II, pp. 7–8]. Defense counsel then asked Plaintiff, "Has there been any sort of transformation at all since then, or any medical sort of drugs, or anything like that taken since 2019?" [*Id.* at p. 8:7–9]. Plaintiff responded, "I tried to start that process while incarcerated in GDC, but it's a very big hurdle to get over, and it's not something the GDC wants to pay for. And it's—it's really been a huge hurdle to try and get over." [*Id.* at p. 8:10–14].

[6] Counselor Brandon McDuffie, Plaintiff's assigned counselor, was also present for this discussion. [Doc. 33-4, Oliver Depo. II, p. 37].

dorm." [*Id.* at p. 36:3–5].[7]

On October 28, 2020, prison officials assigned Plaintiff to segregation in the J-1 building at WSP because Chatham County Sheriff John Wilcher told Warden Whittington that Plaintiff sent threatening letters and emails to the Clerk of Chatham County. [Doc. 33-5, Whittington Aff., ¶ 9]; [Doc. 33-6, Lawson Aff., ¶ 7]. Warden Whittington didn't tell Plaintiff why prison officials assigned him to segregation so that they could protect the integrity of the investigation into Sheriff Wilcher's allegations against Plaintiff.[8] [Doc. 33-5, Whittington Aff., ¶¶ 10–11].

For several weeks while Plaintiff was in segregation, Anquavious Morgan, another inmate in segregation, "tr[ied] to entice [Plaintiff]" to move into his cell with him and asked Plaintiff if he was homosexual through the window in their inmate doors. [Doc. 33-3, Oliver Depo. I, pp. 22:24—23:2, 23:25—24:1]. However, Morgan apparently did more than ask questions, he also made lewd threats. Specifically, Plaintiff testified that Morgan told Plaintiff, "I'm going to fuck your tight, pink ass," and that "he was going to make arrangements for that to happen." [Doc. 33-4, Oliver

---

[7] But, Warden Whittington doesn't recall it this way. In contrast, Whittington testified that he "had no knowledge that [Plaintiff] is or claimed to be transgendered until [he] was informed that the alleged assault by Morgan on [Plaintiff] had occurred." [Doc. 33-5, Whittington Aff., ¶ 14]. As described later, the Court accepts Plaintiff's version of their conversation as required when considering motions for summary judgment.

[8] This doesn't necessarily conflict with Plaintiff's testimony. Plaintiff said he "couldn't find out" why he was in segregation. [Doc. 33-4, Oliver Depo. II, p. 13:12]. At one point, he asked Warden Whittington why he was in segregation, but Whittington responded by asking him why he was in there. [*Id.* at p. 13]. However, Plaintiff testified that he didn't even think that Warden Whittington knew why he was in there. [*Id.* at p. 14:3–6].

Depo. II, p. 17:5–9]. Plaintiff reported *some* of Morgan's comments—namely, that he kept offering Plaintiff drugs and insisted that he would get Plaintiff into his cell with him—to Officer Carruthers. [Doc. 33-3, Oliver Depo. I, p. 25:12–20]. Plaintiff alleges that "all" officers called Morgan the "booty bandit"—including Officers Turner and Stanfield—and that "the staff listened to everything [Morgan] said."[9] [*Id.* at p. 24:20—25:8]. In fact, according to Plaintiff, Morgan "was quite friendly with the prison guards," and "[t]he guards were always passing him contrabands [*sic*]." [*Id.* at p. 23:3–5].

Although Morgan asked Plaintiff if he was gay and offered him drugs, Plaintiff testified that Morgan never made any violent threats toward him before the November 25th incident. [*Id.* at p. 25]. And although Plaintiff correctly described Morgan's comments as "filthy," "derogatory," and "all sexual," he ultimately characterized and considered them as "trash-talking." [Doc. 33-4, Oliver Depo. II, pp. 16:20, 17:17, 17:24]; *see also* [Doc. 33-3, Oliver Depo. I, p. 24:15–24 ("And he was asking—he was asking me if I wanted to engage in any sexual contact with him or sexual activity and that he can get me moved into his cell.")]. As Plaintiff explained, "there's nothing to do in

---

[9] Each Defendant denies having any knowledge of others in the prison referring to Morgan by this moniker. [Doc. 33-5, Whittington Aff., ¶ 15]; [Doc. 33-6, Lawson Aff., ¶ 12]; [Doc. 33-7, Deese Aff., ¶ 21]; [Doc. 33-8, Weaver Aff., ¶ 16]; [Doc. 33-9, Stanfield Aff., ¶ 7]. According to Plaintiff, "one of the women gave [Morgan] the nickname 'Booty Bandit,'" and when he "first heard [the nickname] come out of an officer's mouth, it came from Officer Young and Carruthers [who is female]." [Doc. 33-3, Oliver Depo. I, p. 25:7–8]; [Doc. 33-4, Oliver Depo. II, p. 23:13–18]. But, Plaintiff didn't sue Officers Young and Carruthers.

segregation except talk through the door." [Doc. 33-4, Oliver Depo. II, p. 18:8–9].

On November 25, 2020,[10] Officers Stanfield and Turner[11] moved Plaintiff from an individual cell to a two-person cell in segregation at the J-1 building with Morgan so they could make room for other inmates.[12] [Doc. 33-4, Oliver Depo. II, pp. 15–16, 22]; [Doc. 33-9, Stanfield Aff., ¶ 5]. Plaintiff told Officer Stanfield that he wasn't going into a cell with Morgan, the "Booty Bandit." [Doc. 33-3, Oliver Depo. I, pp. 22:17—23:3, 26:12–13]. Plaintiff testified that Officer Turner said they would tase or spray Plaintiff with pepper spray if he didn't move into Morgan's cell. [Doc. 33-4, Oliver Depo. II, p. 20:15–19]; *see also* [Doc. 33-3, Oliver Depo. I, pp. 26:25—27:2 (Plaintiff testified that at this point, "Turner acknowledged he knew it was 'booty bandit[.]'")].

While Plaintiff confirmed he "was looking for an excuse not to get in" Morgan's cell, he explained he "had a legitimate reason." [Doc. 33-4, Oliver Depo. II, p. 21:8–9].

---

[10] Considering the particular record in this case, it's somewhat difficult to ascertain the exact date and time when Plaintiff's allegations occurred. Plaintiff, understandably, testified that he "never look[s] at a calendar," and that "[w]e don't have any clocks or calendars. I can only go by what staff says . . . ." [Doc. 33-3, Oliver Depo. I, p. 22:9–10]; [Doc. 33-4, Oliver Depo. II, p. 15:9–11]. That said, Plaintiff believes officials moved him to Morgan's cell "the morning of the 25th, the day before Thanksgiving." [Doc. 33-4, Oliver Depo. II, 15:13–14]. However, during another part of his deposition, Plaintiff testified that "he believe[s] Thanksgiving was on the 26th," and that he moved into Morgan's cell on "the morning of Thanksgiving." [Doc. 33-3, Oliver Depo. I, p. 22:9–14]. Doing the best that it can to determine the most accurate timeline, the Court assumes that Plaintiff moved into Plaintiff's cell on November 25, and that the attack occurred at some point during the night of November 25 going into the morning of November 26. [*Id.* at p. 22:11–12 ("I was only in there for one night")].

[11] This time, Plaintiff described Turner as "Steven Turner, which is a man, he's about six-foot-three, six-foot-four, tall black man with glasses." [Doc. 33-4, Oliver Depo. II, p. 15:16–18]. *See supra*, n.1.

[12] At this time, the investigation concerning Plaintiff's alleged threats towards the Clerk of Chatham County was still ongoing. [Doc. 33-5, Whittington Aff., ¶¶ 9–11].

Specifically, a doctor signed a "bottom[-]bunk order" for Plaintiff, and he was "not supposed to be on a top bunk at all."[13] [*Id.* at p. 9–11]. Because the officers knew Plaintiff had a bottom-bunk profile, but spoke with Morgan beforehand and directed Plaintiff into his room anyway, Plaintiff inferred that "the officers and Morgan had it worked out where [Plaintiff] was going to be climbing on the top bed." [*Id.* at pp. 21:13–15, 22:10–22].

After moving into Morgan's cell, "Morgan took off all his clothes down to his underwear." [Doc. 33-3, Oliver Depo. I, p. 29:10–17]. Plaintiff then flagged down Officer Turner when he walked by and told him he needed to leave the cell. [*Id.* at p. 29]. However, Morgan kept yelling at Turner to leave Plaintiff in the cell, "[s]o Turner said, 'I'll be back.'" [*Id.* at p. 29:14–15]. Around this time, Plaintiff alleges that Morgan persistently asked him sexual questions, but then they "talked about other stuff . . . just to bypass the time because Stanfield and Turner told [Plaintiff] that Captain Lawson was on her way to release [him]." [Doc. 33-4, Oliver Depo. II, p. 25:2-10].

Then, after about four hours of talking to Morgan in his cell, Officer Turner pulled Plaintiff out of the cell so that medical staff could check him for Covid-19. [Doc. 33-3, Oliver Depo. I, pp. 29–30]; [Doc. 33-4, Oliver Depo. II, pp. 24–25]. Plaintiff contends that he told Stanfield, Turner, and the nurse that he didn't feel comfortable

---

[13] Importantly, Plaintiff did not list his fear of sexual assault or physical injury as a "legitimate reason" not to enter Morgan's cell, only his bottom-bunk profile that would prevent him from sleeping on the top bunk.

with Morgan in his cell because he thought Morgan was going to do something, had "his penis hanging out," and made "a lot of sexual comments and statements about doing stuff."[14] [Doc. 33-4, Oliver Depo. II, 25:15–24]. Specifically, Plaintiff testified that he "started pleading with Turner outside the medical room not to go back to the Cell 212 with Morgan," but Officer Turner "said it wasn't his call." [Doc. 33-3, Oliver Depo. I, p. 30:19–21]. However, Plaintiff confirmed that at this point, which Plaintiff thought was around 11:00 a.m. the morning before the attack,[15] Morgan had yet to make any specific threat toward him. [Doc. 33-4, Oliver Depo. II, p. 26:11–14].

When Plaintiff got back to Morgan's cell after leaving medical, Morgan "was in bed in his underwear masturbating as [Plaintiff] was walking in." [Doc. 33-3, Oliver Depo. I, p. 31:7–9]. Plaintiff testified that he pretended not to pay him any attention and then used the bathroom. [*Id.* at p. 31:12–14]. Afterwards, he then tried "to call for Stanfield or Turner to call Captain Lawson, because [he] just knew something was wrong at this point." [*Id.* at p. 31:17–20]. Around this time (10:30 or 11:00 a.m., because "lunch came early that day"), Morgan asked Plaintiff if he wanted to give him oral sex, and Plaintiff told him no. [*Id.* at pp. 32:21–25; 33:3–12]. After about 15 or 20 minutes

---

[14] Plaintiff contends that he told Nurse Randy Chastain about some of Morgan's sexual comments and that Nurse Chastain noted his concerns in the medical records. [Doc. 33-4, Oliver Depo. II, pp. 25–26] However, Plaintiff never put the medical records into evidence.

[15] In another part of his deposition, Plaintiff testified that he believed he left medical to go back to his cell around 9:30 a.m. [Doc. 33-3, Oliver Depo. I, pp. 30:24—31:4].

went by, and Morgan went "berserk," accusing Plaintiff of being a child molester and stating that Turner and Stanfield told him that Plaintiff was a child molester.[16] [*Id.* at p. 33:3–6]; *see also* [*id.* at pp. 27–28, 33].

After that discussion, Plaintiff told Morgan that he had a release order that Captain Lawson signed that would release him from the segregation unit. [Doc. 33-3, Oliver Depo. I, pp. 33–34]. However, Morgan told Plaintiff "[y]ou're staying right here with me" and that his release order didn't matter. [*Id.* at p. 34:1–3].

Plaintiff applied for release from segregation in the middle of November 2020 and received the release order from Captain Lawson "[a]bout a week before the incident." [*Id.* at p. 34:4–6]. According to Plaintiff, Captain Lawson took Plaintiff's proposed release order and gave it to the warden who then signed it and gave it back to Captain Lawson. [*Id.* at p. 34]. However, Plaintiff contradicted himself later in his deposition. That is—Plaintiff testified that at some point after being in segregation, he called a lawyer in Illinois, asked him to call the warden's office to inform him that he had "been sitting here for a while and no access [*sic*] to the law library," and that Plaintiff should be released from segregation. [Doc. 33-4, Oliver Depo. II, p. 14:9–13]. According to Plaintiff, Warden Whittington then came to his cell with "a request to be released." [*Id.* at p. 14:14–15]. Plaintiff filled it out, and Warden Whittington signed it,

---

[16] To be clear, Plaintiff testified that he is not a registered sex offender. [Doc. 33-3, Oliver Depo. I, p. 33:15–20].

detached a copy and gave Plaintiff a receipt for it, and then gave the original to Captain Lawson and told her to release Plaintiff.[17] [*Id.* at p. 14:15–20].

In any event, Plaintiff alleges that Lawson refused to follow the warden's order and didn't want to release him. [Doc. 33-3, Oliver Depo I, p. 34]. Plaintiff claims that he was supposed to be released from segregation "immediately," although that didn't happen.[18] [*Id.* at p. 35]. When Captain Lawson came into Plaintiff's building to hand out Thanksgiving lunch, she was in a bad mood, told Plaintiff that she didn't want to be there, released only three or four inmates from segregation back to general population, and told Plaintiff that although she had his release order, he wasn't going anywhere. [*Id.* at pp. 34–36]. Captain Lawson didn't give Plaintiff a reason for not releasing him. [*Id.* at p. 36:21–24].

Around 6:00 p.m., Plaintiff contends that he went to the door of his cell and told prison officers—including Officer Deese—that he needed to leave the cell because he didn't feel safe and had a release order meant to remove him from segregation. [Doc. 33-3, Oliver Depo. I, p. 39]. Plaintiff claims that Officer Deese told him that he wasn't

---

[17] Warden Whittington testified that he "did not control regular transfer requests regarding housing of inmates." [Doc. 33-5, Whittington Aff., ¶ 13]. Instead, according to him, prison staff members forwarded inmate transfer requests "to the Deputy Warden of Administration for review and either approval or denial." [*Id.*]. This may be technically correct. However, taking Plaintiff's testimony as true, Warden Whittington had at least some impact on placing and moving inmates within the prison.

[18] Specifically, Plaintiff testified: "[Warden Whittington] gave it to [Captain Lawson] on a Tuesday. I was supposed to be released the—the upcoming Thursday. The day—the night before the sexual assault occurred. And eventually, I was released after the sexual assault." [Doc. 33-4, Oliver Depo. II, p. 14:21–25].

going anywhere and to "take that up with the captain tomorrow." [*Id.* at p. 39:9–10]. Plaintiff also testified that around 6:30 or 7:00 p.m., when Deese and Weaver walked by his cell, Morgan had not made any threats toward him. [Doc. 33-4, Oliver Depo. II, p. 58]. Around 9:00 p.m., when Plaintiff saw Officer Weaver signing the log sheets, Plaintiff told Officer Weaver that he didn't feel safe and wanted to go to another cell. [Doc. 33-3, Oliver Depo. I, p. 39]. Like Officer Deese, Officer Weaver told him to "talk to the captain tomorrow." [*Id.* at p. 39:19].

Critically, in response to Defendants' Statement of Undisputed facts, Plaintiff indisputably, clearly, and unambiguously admitted that "*[a]ny threats* made by Morgan to Oliver *prior to November 25, 2020*, though sexual in nature, were characterized by Oliver as 'trash-talking' and *were not communicated to any Defendant*." [Doc. 36-1, ¶ 30 (emphasis added)]. Just as importantly, Plaintiff also unequivocally admitted that "[n]o specific threats were made to Oliver by Morgan on November 25, 2020, prior to when Oliver was attacked that evening." [*Id.* at p. 8, ¶ 31].

Morgan attacked and raped Plaintiff at some point between 9:00 p.m. on November 25, 2020, and the early morning hours of November 26, 2020.[19] *See generally*

---

[19] Specifically, Plaintiff testified that, "After [Morgan] smoked something, it was probably 8:30, 9:00, maybe eight o'clock. [Morgan] pulled me from the top bunk and began punching me." [Doc. 33-4, Oliver Depo. II, p. 28:18–20]. Again, it is somewhat difficult to determine the precise timeline of events in this case. According to Plaintiff, he was moved into Morgan's cell in the morning on the same day he was attacked. [Doc. 33-3, Oliver Depo. I, pp. 21–22]. However, Defendant Stanfield stated in his affidavit that his shift ended around 6:00 p.m. on the night of the attack, "which was directly after [he] moved Oliver into the cell with Morgan." [Doc. 33-9, Stanfield Aff., ¶ 10]. In any event, neither party disputes that Plaintiff only spent one night in Morgan's cell, and Morgan attacked Plaintiff on that night.

[Doc. 33-3, Oliver Depo. I]; [Doc. 33-4, Oliver Depo. II]. Morgan had been consuming drugs before raping and attacking Plaintiff and "was extremely high on marijuana." [Doc. 33-3, Oliver Depo. I, p. 37:23–24]; [Doc. 33-4, Oliver Depo. II, pp. 26–28]. Specifically, Morgan pulled Plaintiff from the top bunk in the cell, body-slammed him to the ground (breaking his back), and then raped him orally and anally. [Doc. 33-4, Oliver Depo. II, pp. 28–34]. Morgan then forced Plaintiff to drink chemicals to eliminate traces of Morgan's semen. [*Id.*].

The Court will discuss additional facts and allegations as they become relevant in the analysis below.[20]

---

[20] The parties dispute several facts in this case. The Court mentions a few of them here. First, the parties dispute whether Defendants knew whether Plaintiff was transgender before Morgan raped him. *See* [Doc. 33-5, Whittington Aff., ¶ 14]; [Doc. 33-6, Lawson Aff., ¶ 11]; [Doc. 33-7, Deese Aff., ¶ 20]; [Doc. 33-8, Weaver Aff., ¶ 15]; [Doc. 33-9, Stanfield Aff., ¶ 11]. Second, Plaintiff testified that he told Defendants Deese and Weaver that he needed to get away from Morgan and "needed to be removed from the cell," but that Deese and Weaver "just kept on walking." [Doc. 33-4, Oliver Depo. II, p. 58:2–4]. However, Defendant Deese stated that "[a]t no time [prior to Morgan attacking Plaintiff] did [he] have contact with Oliver, nor did [he] hear [Plaintiff] state that he needed to be removed from his cell with inmate Anquavious Morgan." [Doc. 33-7, Deese Aff., ¶¶ 8–11]. Defendant Weaver said the same. [Doc. 33-8, Weaver Aff., ¶ 12]. The parties also dispute whether Defendants Deese and Weaver falsified the logs that GDC policy required them to sign. *See* [Doc. 36, pp. 6–7]; [Doc. 33-7, Deese Aff., ¶ 23]; [Doc. 33-8, Weaver Aff., ¶ 18]. Finally, Plaintiff testified that "[w]hen Deese looked in" Plaintiff's cell after Morgan attacked him, "he saw blood on the back of [his] pants, and he said, 'okay, I'm going to get you out, sit tight.'" [Doc. 33-4, Oliver Depo. II, p. 62:18–20]. However, Defendant Deese stated in his affidavit that he "did not observe any blood or any other fluids on the person of Oliver or in the cell that [he] secured." [Doc. 33-7, Deese Aff., ¶ 15]. But, "[a]n issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004); *United States Sugar Corp. v. Commerce & Indus. Ins. Co.*, 22-21737-Civ-Scola, 2023 WL 2757027, at *4 (S.D. Fla. Apr. 3, 2023).

As outlined in the legal standard below, "on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record." *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). The Court does so.

## DISCUSSION

### A.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *U.S. v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437 (citations and punctuation omitted). The movant may cite to particular parts of materials in the record, including "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (punctuation omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[21]

"When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the

---

[21] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56©(3).

opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438.

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations and punctuation omitted). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

[s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

**B.**     **Defendants' Motion for Summary Judgment**

In support of their Motion, Defendants contend that they are entitled to qualified immunity because they "are not aware of a single United States Supreme Court, Eleventh Circuit[,] or Georgia Supreme Court case that clearly establishes that their conduct as shown by the evidence in this case amounts to a violation of law." [Doc. 33-2, p. 14].

"The defense of qualified immunity completely protects government officials

performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (citations and quotations omitted). Since neither party disputes that Defendants acted within the scope of their discretionary authority as correctional officers working at WSP at all relevant times, the burden shifts to Plaintiff to show that Defendants violated a constitutional right and that the right was clearly established at the time of the alleged violation.

### C.   Eighth Amendment Claim

Violent assaults in prison are not "part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). And, no one disputes that prison officials must reasonably protect prisoners from violence at the hands of other prisoners and that a prison official's deliberate indifference to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828, 833 (citation omitted). That said, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into *constitutional* liability for prison officials responsible for the victim's safety." *Id.* at 834 (emphasis added).

To establish a § 1983 claim for deliberate indifference, the prisoner must first "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citation omitted). Second, "a prison official must have a 'sufficiently

culpable state of mind' . . . one of 'deliberate indifference' to [the prisoner's] health or safety[.]" *Id.* (citations omitted). Even if the prisoner shows an Eighth Amendment violation, the prisoner must also be able to demonstrate "causation" between that violation and the prison official's conduct. *Marbury*, 936 F.3d at 1233. In short, "[t]o survive summary judgment on a deliberate indifference failure-to-protect claim, '[Plaintiff] must produce sufficient evidence of (1) a substantial risk of serious harm; (2) . . . [D]efendant[s'] deliberate indifference to that risk; and (3) causation.'" *Mosley v. Zachary*, 966 F.3d 1265, 1270 (11th Cir. 2020) (citing *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)).

### 1.   *Substantial Risk of Serious Harm*

Turning first to whether Plaintiff faced a substantial risk of serious harm, this element "is assessed objectively and requires [Plaintiff] to show 'conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety.'" *Marbury*, 936 F.3d at 1233 (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). "[A]n excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm." *Lane*, 835 F.3d at 1307 (citations omitted). However, "occasional, isolated attacks by one prisoner on another may not constitute" an Eighth Amendment violation. *Id.* Instead, it is "confinement in a prison where violence and terror reign [that] is actionable." *Id.*

There are two ways by which Plaintiff can show an objectively substantial risk of

17

serious harm: (1) by presenting an individual risk that is personal to him, or (2) by showing an environmental risk based on generally dangerous prison conditions. *See Bugge v. Roberts*, 430 F. App'x 753, 758 (11th Cir. 2011); *Marbury*, 936 F.3d at 1234 (citations omitted) ("To establish deliberate indifference based on a generalized risk, the plaintiff must show 'that serious inmate-on-inmate violence was the norm or something close to it.'"). Here, Plaintiff must proceed on the individualized-risk track because he failed to submit any evidence into the record showing that WSP is a generally dangerous prison.[22]

However, Plaintiff fails to show an objectively substantial risk personal to him. *See generally* [Doc. 1]; [Doc. 36]. Instead, Plaintiff seems to argue that simply because he is a man that claims to be a woman, he was at a substantial risk of serious injury from Morgan or other inmates. Plaintiff seemingly would have the Court plow new Constitutional ground to require all prison officials to provide every transgender prisoner with additional protections simply because they identify as the opposite gender.

In addition to Plaintiff's transgender status, Plaintiff attempts to argue that he was in danger because of Morgan's statements and past behavior. But the evidence in this record doesn't support that conclusion. To begin, Plaintiff testified that before

---

[22] Even if Plaintiff attempted to take this route and argue that WSP is a generally dangerous institution, he would not be successful because "he has made no allegations regarding the specific features of the prison that would make it particularly violent." *Marbury*, 936 F.3d at 1235.

moving into Morgan's cell, Morgan did not make any threats of violence towards him. [Doc. 33-3, Oliver Depo. I, p. 25]; [Doc. 36-1, ¶ 31]. Instead, he described Morgan's comments as "trash-talking," "filthy," and "all sexual" and further, he admitted that he never relayed this "sexual" trash talk to *any* Defendant. [Doc. 33-4, Oliver Depo. II, p. 17:17, 17:24]; [Doc. 36-1, ¶ 30]. Had he told Defendants that Morgan specifically threatened to rape or sexually assault him, that would likely have been enough to survive summary judgment. However, Plaintiff specifically admitted that he never reported any threat to any Defendant. [Doc. 36-1, ¶¶ 30–31].[23]

In the Eleventh Circuit, "[t]here must be a 'strong likelihood' of injury, 'rather

---

[23] Notwithstanding Plaintiff's admissions that he never told any Defendant of any threat or of the sexual remarks that Morgan made to him, Plaintiff attempts to deny that he never told Defendants of threats to his safety in paragraphs 17, 20, 23, and 26 of his Response [Doc. 36-1] to Defendants' Statement of Undisputed Facts. It is important to note that Plaintiff never submitted an affidavit in opposition to Defendants' motion. It is axiomatic that a party cannot make contradictory statements so as to create a genuine issue of material fact sufficient to defeat a motion for summary judgment.

> However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). In addition, conclusory allegations based on purely subjective beliefs of a plaintiff and assertions of which he lacks personal knowledge are likewise insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

*Chambers v. Meeks*, 2:18-CV-558-SRW, 2021 WL 2926289, at *3 (M.D. Ala. July 12, 2021). *See also Denney v. City of Albany*, 247 F.3d 1172, 1184 (11th Cir. 2001) (holding that Plaintiffs' admissions made in connection with Defendants' statement of material facts in support of their motion for summary judgment conflicted with Plaintiffs' argument, and that the court "could decide the appeal on this basis alone"); *Jones v. Gerwens*, 874 F.2d 1534, 1537 n. 3 (11th Cir. 1989) (treating fact as conceded, in accordance with local district court rule, where party opposing summary judgment failed to controvert the fact as described in the movant's statement of undisputed material facts); *American Nat'l Bank v. FDIC*, 710 F.2d 1528, 1536 (11th Cir. 1983) (applying doctrine of judicial estoppel, which applies "to the calculated assertion of divergent sworn positions").

than a mere possibility'" before liability under the Eighth Amendment will attach.

*Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). Plaintiff's deliberate indifference

claim fails because he has not demonstrated a genuine issue of material fact as to

whether he faced a strong likelihood of a substantial risk of injury based on sexual trash

talk that no defendant knew anything about. And Plaintiff hasn't identified a single case

holding that "trash talk," even "filthy," "all sexual" "trash talk," automatically rises to a

level that, if actually communicated to a prison official, would put those prison officials

on notice of a strong likelihood of a substantial injury.

Plaintiff never offered any evidence that other inmates had told him about an

occasion when Morgan had ever raped or attacked another inmate.[24] In fact, Plaintiff

hasn't offered any evidence at all that Morgan had ever raped or assaulted anyone prior

to the night he raped him. Although Plaintiff referred to Morgan as a "known sexual

predator" in his Complaint [Doc. 1, ¶ 12], and then described him as having

"propensities of sexually assaulting other offenders who were gay, bisexual[,] or

transgender inmates" in his Response to Defendants' Motion for Summary Judgment,

[Doc. 36, p. 3], when it came time to back up these bold accusations with actual

---

[24] However, on deposition, Plaintiff testified that he remembers that Morgan "had one [cellmate], one day, and the female officers had to rush him out of there real fast." [Doc. 33-4, Oliver Depo. II, p. 18:16–18]. Everyone told the other inmate not to go into the cell with Morgan, but "the guy didn't know any better. He was probably in there maybe eight or nine hours." [*Id.* at p. 19:5–7]. Plaintiff said that he didn't know the specifics behind why the other inmate had to leave the cell "on such a short, short notice," but that he could "only imagine" because Morgan is "a high-violent, gang member." [*Id.* at p. 19:10–22]. Needless to say, this vague and speculative description of an earlier incident doesn't help Plaintiff's case.

admissible evidence, he offered none. It goes without saying that when it comes to opposing a motion for summary judgment, one must rely on evidence, not rhetoric. Simply saying that someone is a sexual predator isn't enough.

And accepting Plaintiff's allegations as true—that Morgan made "trash-talking" comments to him and that others called him the "Booty Bandit"—Plaintiff still fails to show how Morgan was in any way more likely to rape and attack *him* than any other inmate, especially because Plaintiff admitted he never told any Defendant about any threats or even the sexual comments. [Doc. 33-4, Oliver Depo. II, p. 17:17]; [Doc. 36-1, ¶¶ 30–31].

Based on binding precedent, mere possibilities of an assault are never enough— Plaintiff needed to plausibly allege a strong likelihood of serious harm. *Brooks*, 800 F.3d at 1301. Here, when it comes to actual evidence, Plaintiff can at best show that he was a transgender inmate who was housed with another inmate who made filthy trash talk about sexual things. He offers no admissible evidence that Morgan was a "known sexual predator" or that Morgan had ever sexually assaulted any inmate. This evidence does not rise to a sufficient level to show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Mosley*, 966 F.3d at 1270 (citations omitted). Simply put, his Eighth Amendment claim fails.

His inability to establish the first element could end the analysis. However, out of an abundance of caution, the Court will, for argument's sake, assume that even if the

21

facts of this case could demonstrate a substantial risk of serious harm, there is nothing in the record to show that Defendants were aware of—or were deliberately indifferent to—that risk.

### 2. *Deliberate Indifference to a Substantial Risk of Serious Harm*

The second element—whether Defendants were deliberately indifferent to the substantial risk of serious harm—"has both a subjective and an objective component." *Marbury*, 936 F.3d at 1233; *Mosley*, 966 F.3d at 1270. That is, Plaintiff must show both that Defendants actually—or subjectively—knew that he faced a substantial risk of serious harm and that they disregarded that known risk by failing to respond to it in an objectively reasonable manner. *Mosley*, 966 F.3d at 1270 (citations omitted). Even if Plaintiff can establish that Defendants actually knew of a substantial risk to his safety, Defendants "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844–45.

### a. *Plaintiff's Specific Claims Against Each Defendant*

In short, and by Plaintiff's own clear admission, Morgan didn't make any threats of violence towards Plaintiff before he was moved into the same cell with Morgan. [Doc. 36-1, ¶ 31]. And, as the Court has repeatedly mentioned, Plaintiff admitted that he never communicated any sexual threat of any sort to any Defendant. [*Id.* at ¶ 30]. Therefore, to survive summary judgment, Plaintiff must provide evidence showing that Defendants learned of threats of violence to Plaintiff that Morgan made after Plaintiff

moved into his cell. He hasn't. To show why, let's break down whether each Defendant could have known about any potential threat to Plaintiff's safety after Plaintiff moved into Morgan's cell.

### i.     Warden Whittington

First, Defendant Whittington testified that he "at no point" spoke with Plaintiff about threats he received from other inmates, but that "[a]ny conversations [he] did have with [Plaintiff] prior to the assault by Morgan were limited to [Plaintiff] asking why he was in segregation and when he could be transferred back to the general population." [Doc. 33-5, Whittington Aff., ¶¶ 5, 12]. If Plaintiff ever did alert Warden Whittington of any threat from Morgan, Warden Whittington testified that he would have immediately removed Plaintiff from his specific cell and placed him in protective custody while the Sexual Assault Response Team ("SART") investigated any potential danger to him. [*Id.* at ¶ 6]. Plaintiff himself testified in his deposition that he "never spoke to [Whittington] about—about him, about Morgan." [Doc. 33-4, Oliver Depo. II, p. 35:5–6]. Instead, Plaintiff simply said that "Warden Whittington was already knowledgeable who [Morgan] was . . . ."[25] [*Id.* at p. 35:6–7]. Plaintiff testified that before the attack, any conversation he had with Warden Whittington—excluding his discussion about his transgender status upon his arrival at WSP—was limited to why

---

[25] When defense counsel asked Plaintiff in his deposition, "Mr. Oliver, so you didn't have any conversations with Warden Whittington about Morgan prior to your attack, correct?" Plaintiff responded, "No, I did not." [Doc. 33-4, Oliver Depo. II, p. 35:18–21].

officials placed him in segregation in the J-building. [*Id.* at pp. 34–35]. In other words, Plaintiff did not speak with Warden Whittington at all about Morgan prior to the attack. Additionally, Plaintiff testified that he didn't know if Warden Whittington was at the prison when he was attacked. [*Id.* at pp. 39:9—40:3].

Because Plaintiff never spoke to Warden Whittington about threats Morgan made—or about Morgan at all—Plaintiff fails to show how Warden Whittington was deliberately indifferent to Plaintiff's safety. This holds true even if Warden Whittington knew about his transgender status from the first day Plaintiff arrived at WSP.

Finally, in Plaintiff's Complaint, he alleges that he "filed a grievance concerning failure to protect him from rape, physical[,] and sexual attack and has appealed the denial of the grievance." [Doc. 1, ¶ 24]. Specifically, he alleged that when Warden Whittington learned that Plaintiff filed a grievance, he "tore up the grievance in front of Plaintiff and the entire dorm," said, "'I don't want to see this [filing of grievance] anymore, queerbait,'" and then brought Plaintiff back to the segregation unit. [*Id.* at ¶¶ 25–26]. Plaintiff claimed in his Complaint that he then filed a subsequent grievance, and Whittington "tore up" that one, too. [*Id.* at ¶ 27].

It's unclear how Plaintiff's allegations regarding Whittington tearing up his grievances relate to his deliberate indifference claim.[26] But, accepting them as true, none

---

[26] In his depositions, Plaintiff goes into detail when he describes how Defendant Whittington tore up his grievances. However, Plaintiff has only made one claim—deliberate indifference to and failure to protect Plaintiff from a known risk. He hasn't made a claim of retaliation for making the grievance in violation of

of Plaintiff's factual allegations relating to Whittington tearing up his grievances show

how he was in any way deliberately indifferent to a serious risk of harm towards

Plaintiff.[27]

### ii.    *Captain Lawson*

Next, Defendant Lawson. Plaintiff makes many allegations against her that are

either unsupported by evidence or unrelated to any claim of deliberate indifference.

First, Plaintiff admitted that Defendant Lawson wasn't at WSP when Morgan attacked

Plaintiff. [Doc. 36-1, ¶ 18]. Plaintiff also testified that "the only time that [he] saw

---

his First Amendment rights. In sum, the events surrounding his grievances that occurred after the rape and physical assault are irrelevant to his sole Eighth Amendment claim except to the extent that they show Plaintiff exhausted his administrative remedies.

[27] On deposition, Plaintiff testified that he filed his first grievance "protesting the issue of [Plaintiff] being in the cell with [Morgan]," sometime after officials placed him into Morgan's cell. [Doc. 33-4, Oliver Depo. II, p. 40:11–15]. Because Morgan attacked Plaintiff on the first and only night that they shared a room, the Court assumes Plaintiff filed this grievance at some point after being placed in Morgan's cell on November 25, 2020. He gave that grievance to PREA Coordinator Karen Dunnigan, who then signed it and gave Plaintiff a receipt for it. [*Id.* at pp. 8:17–19, 40:16–18]. He later spoke with Warden Whittington about why he was still in segregation despite his release order. [*Id.* at pp. 40–41]. Whittington said Plaintiff should be in general population but seemingly did nothing about it. [*Id.*]. In any event, this conversation concerned Plaintiff's placement in segregation, and Whittington did not tear up Plaintiff's first grievance during this conversation. [*Id.* at p. 41:12–14]. And although Plaintiff's counsel confirmed that Plaintiff had given him a number of grievances that he had filed and promised to get them to opposing counsel, the record doesn't contain any grievances at all. [*Id.* at p. 71].

Regardless, "simply failing to respond to or denying a grievance does not, in and of itself, make a prison official liable for an alleged constitutional violation 'brought to light by the grievance.'" *Harris v. Dixon*, No. 3:22-CV-667-BJD-LLL, 2022 WL 4182532, at *3 (M.D. Fla. Sept. 13, 2022) (quoting *Jones v. Eckloff*, No. 2:12-cv-375-FTM-29DNF, 2013 WL 6231181, at *4 (M.D. Fla. Dec. 2, 2013)). Additionally, inmates have "no constitutionally protected liberty interest in access to the prison's grievance procedure[; therefore, a plaintiff] cannot base a § 1983 claim on [a defendant's] response to his grievances." *Moore v. McLaughlin*, 569 F. App'x 656, 659 (11th Cir. 2014) (citing *Bingham v. Thomas*, 654 F.3d 1171, 1177 (11th Cir. 2011)); *see also Mathews v. Moss*, 506 F. App'x 981, 984 (11th Cir. 2013) (finding the plaintiff failed to state a claim because he merely "alleged that his prison grievances were either ignored or wrongly decided or that prison officials did not properly follow the prison's own grievance procedures").

[Lawson] was after the attack when the GBI showed up" and that he didn't speak to Lawson at all about any threats from Morgan before the attack. [Doc. 33-4, Oliver Depo. II, p. 47:15–21]. Because she was the facility-on-call-duty officer during the week Morgan attacked Plaintiff, she wasn't present at WSP during the attack and "was only called to Wilcox after the alleged assault had occurred." [Doc. 33-6, Lawson Aff., ¶ 5].

All of that said, Plaintiff's claims against Lawson seem to boil down to the fact that she allegedly knew Plaintiff was transgender and that Morgan was a known sexual predator, and she directed Stanfield and Turner to place Plaintiff in Morgan's cell anyway. *See* [Doc. 36, p. 8].

Plaintiff admitted at one point on deposition that he was unsure whether he ever told Lawson about his transgender status. [Doc. 33-4, Oliver Depo. II, p. 49:14–19]. However, he testified at a later point that he told Captain Lawson he had a right to wear his shirt to the showers because he was "classified as transgender." [*Id.* at p. 56:10–24]. Because Plaintiff is the nonmoving party, the Court accepts that Lawson knew Plaintiff was transgender.

Though he didn't mention this in his Complaint, Plaintiff argues in his Response that "Capt. Lawson long suspected Plaintiff of being a federal informant for the Federal Bureau of Investigation," and seemingly used this as her reason for ordering Stanfield and Turner to place Plaintiff into a cell with Morgan. [Doc. 36, p. 2]. However, Plaintiff offers nothing in the record to support his uncorroborated allegations and speculations

about Defendant Lawson. As the Court previously noted, Plaintiff offers nothing to show that Morgan was a "known sexual predator," or how Defendant Lawson knew of Morgan's desire to harm Plaintiff. Additionally, Plaintiff offers nothing but his speculation that Defendant Lawson thought that the FBI was using Plaintiff as a snitch. A party can't simply say what someone else knew or observed or thought and expect the Court to accept that alone as admissible evidence. Thus, the Court finds that these speculations do not support his claim for deliberate indifference to a known safety risk.

Plaintiff also argues that Lawson didn't follow the warden's orders by refusing to release Plaintiff from segregation even though Plaintiff had a release order that the warden signed and gave back to Lawson. [Doc. 33-3, Oliver Depo. I, p. 34]. But, even if taken as true, that fact would not support a finding of a violation of a Constitutional right.

Finally, Plaintiff alleges that Lawson encouraged him to commit suicide "immediately after the incident," because "she thought that [Plaintiff] was making up the allegations."[28] [Doc. 33-4, Oliver Depo. II, pp. 47:21—48:2]. Again, even if Lawson encouraged Plaintiff to commit suicide—unprofessional and cruel to say the least—it is unclear how this in any way relates to his claim that prison officials were deliberately

---

[28] Specifically, Plaintiff testified that officials left him in a "one-man cell . . . with no electricity" in segregation "while inmate Morgan got released." [Doc. 33-4, Oliver Depo. II, p. 48:10–12]. While Plaintiff was in that cell, Lawson told Plaintiff that "she works at a funeral home in town. And that if [Plaintiff] committed suicide, she'd give [him] a really good deal on a used coffin." [*Id.* at p. 48:17–24].

indifferent to his safety when they placed him in Morgan's cell or left him in Morgan's cell.

In short, Plaintiff fails to overcome summary judgment on any of his claims against Defendant Lawson.

### iii.    *Officer Stanfield*

Like Lawson, Officer Stanfield wasn't at WSP during the attack because "[his] shift ended around 6:00 p.m., which was directly after [he] moved [Plaintiff] into the cell with Morgan." [Doc. 33-9, Stanfield Aff., ¶ 10]. Plaintiff alleges that "[a]t the direction of Lawson, Turner and Stanfield forced Plaintiff into being housed in a cell with a known sexual predator." [Doc. 1, ¶ 30]. However, when asked, "[d]oes Stanfield have any knowledge about threats from Morgan towards you?" Plaintiff responded, "I don't know."[29] [Doc. 33-4, Oliver Depo. II, p. 53:23–25]. Based on this answer, Plaintiff's allegations that Stanfield knew of a risk to Plaintiff from Morgan fall short.

However, as on many other occasions, Plaintiff's deposition testimony seems to contain many contradictions. For example, Plaintiff alleges that when Stanfield and Turner ordered Plaintiff to move into Morgan's dorm, he told them that Morgan was the "Booty Bandit." [Doc. 33-3, Oliver Depo. I, p. 26:13]. Then, according to Plaintiff,

---

[29] However, when it comes to Defendant Stanfield's knowledge of his transgender status, Plaintiff testified that the door sheets that policy required him to sign noted his transgender status. [Doc. 33-4, Oliver Depo. II, p. 54]. But, Plaintiff never submitted these door sheets into evidence. Plaintiff testified that he also told Officer Stanfield he was transgender when he told him that he had a right to wear a shirt to the showers as opposed to just his underwear. [*Id.* at p. 54]. Stanfield oversaw inmate showers in the J-building on Mondays, Wednesdays, and Fridays. [*Id.* at p. 55].

"Stanfield became extremely angry and violent, and he specifically told [Plaintiff], I been [*sic*] here for 14 hours. You're gonna go in there as I tell you, or I'm gonna tase you and spray you right now . . . ." [*Id.* at p. 26:14–17]. During his Covid-19 check, when he briefly left Morgan's cell, Plaintiff told Stanfield that he didn't feel "comfortable" with Morgan in his cell. [Doc. 33-4, Oliver Depo. II, p. 25:21]. However, Plaintiff clearly admitted that Morgan hadn't made any specific threat of violence toward Plaintiff at this point. [*Id.* at p. 26:11–14].

Although the Court accepts Plaintiff's contentions that Stanfield knew he was transgender, Plaintiff has failed to show that Stanfield had any knowledge about any threats from Morgan towards him. [*Id.* at pp. 53–54]. Because Stanfield didn't know about any dangers from Morgan, Plaintiff fails to show how Stanfield was deliberately indifferent to any potential risk of harm facing him.

### iv.   *Officers Deese & Weaver*

That leaves Defendants Deese and Weaver—the two Defendants actually at WSP during the attack—as remaining Defendants who could have been on notice of a substantial risk of serious harm to Plaintiff.

Plaintiff unsurprisingly disputes much of the testimony from Defendants in their affidavits. With Plaintiff's version of the facts and Defendants' version, we clearly have "competing narratives [that] emerge on key events." *Sconiers*, 946 F.3d at 1263. The Court, therefore, is "not at liberty to pick which side [it] think[s] is more credible." *Id.*

No, what the Court must do is "accept as fact all allegations" that Plaintiff made, as "the [nonmoving] party," to the extent "they are sufficiently supported by evidence of record." *Id.* (citing *Anderson*, 477 U.S. at 251). In Plaintiff's view, "Officers Deese and Weaver falsified their log sheets signing the logs as if they did their security checks when they did not."[30] [Doc. 36, p. 6]. Defendants, unsurprisingly, deny this. *See* [Doc. 33-7, Deese Aff., ¶ 23]; [Doc. 33-8, Weaver Aff., ¶ 18]. Regardless, even viewing the facts in a light favorable to Plaintiff, Plaintiff's own deposition reveals why he can't overcome qualified immunity for Defendants Deese and Weaver or survive summary judgment.

According to Plaintiff, when Deese and Weaver came by his cell around 6:30 or 7:30 p.m., he told them that they needed to remove him from the cell with Morgan. [Doc. 33-4, Oliver Depo. II, p. 58]. However, Plaintiff testified that "[t]hey just kept on walking." [*Id.* at p. 58:1–5]. Critically, Plaintiff testified that Morgan had made no specific threats toward him by this time. [*Id.* at p. 58]; *see also* [Doc. 36-1, ¶¶ 30–31]. Plaintiff saw Deese a second time around 8:30 or 9:00 p.m. and attempted to talk to him again, and Deese ignored him this time, too. [Doc. 33-4, Oliver Depo. II, pp. 60–61]. Earlier in his testimony, Plaintiff testified that he saw Weaver sign the log sheets around 9:00 p.m. and told him he didn't feel safe, but Weaver told him to "talk to the captain

---

[30] According to Plaintiff, the prison officers are "supposed to come by every 30 minutes and sign a half-hour log sheet attached to a clipboard on the front of the cell." [Doc. 33-3, Oliver Depo. I, p. 40:1–3].

tomorrow." [Doc. 33-3, Oliver Depo. I, p. 39:14–21]. Again, Morgan had made no

specific threats toward him by this time. [Doc. 33-4, Oliver Depo. II, pp. 60–61].

According to Plaintiff, when he saw Deese again around 1:00 or 1:30 a.m., Morgan had

already assaulted him. [*Id.* at pp. 58–59]. "Morgan had fell [*sic*] asleep permanently,"

and Plaintiff shoved a note in Deese's face that said he had been raped. [*Id.* at 58–60].

This is another point where the timeline becomes slightly unclear. Plaintiff also

testified that he believes the attack occurred around 9:30 p.m. [Doc. 33-4, Oliver Depo.

II, pp. 58–59]. Around this time, he "was e-mailing the PREA hotline" from an inmate

tablet he had. [*Id.* at p. 59:1–3]. Plaintiff also testified that, "[t]he last time [he] saw Deese

was at 9:38, and that was the time [he] told [Deese that he] had been raped, and [Deese]

didn't do anything. [Deese] just kept on walking. [Deese] was by himself." [*Id.* at p.

59:4–7]. Plaintiff believes Deese "disappeared between 9:38 [p.m.] and 1:30 [a.m.]." [*Id.*

at p. 61:22–24]. However, Plaintiff initially called him "Officer Something Else because

[Deese] wears a coat with a different name tag on it." [*Id.* at p. 59:8–10]. He said that he

didn't know if that was why Deese didn't respond to him.[31] [*Id.* at p. 59:10–13]. In any

event, and consistent with his later testimony, Plaintiff testified that "it wasn't until

later after the incident, maybe one o'clock, one-thirty," when he gave a note to Deese

---

[31] Plaintiff further muddies his version of the timeline—and his claims—in his Response to Defendants'
Motion for Summary Judgment. That is, he argues that Deese and Weaver did not conduct their security
checks "during the hours of 9:00 p.m. until 1:30 a.m." [Doc. 36, p. 6]. In other words, if Plaintiff's version
of the timeline in his Response is true, he didn't speak to Deese about the rape at 9:38 p.m. As stated
earlier, Plaintiff hasn't presented a claim of deliberate indifference to a serious medical need.

informing him that he had been raped. [*Id.* at p. 59:14–17]. Plaintiff testified that after he

gave Deese the note, Deese—and a team of six or seven officers—arrived at his cell

around 40 minutes later. [*Id.* at pp. 62–63].

Although Plaintiff claims that Deese and Weaver falsified the log sheets they

were supposed to sign, his timeline largely tracks with Deese's affidavit.[32] Deese

testified that he "reported for duty around 6:00 p.m." on November 25, 2020, to conduct

security checks in the J-1 building. [Doc. 33-7, Deese Aff., ¶ 4]. However, he also

assisted with security in other buildings that night because the prison was short-

staffed.[33] [*Id.* at ¶ 6]. Because of the lack of staff in the prison, security-check rounds

could take up to 90 minutes in each building. [*Id.* at ¶ 7]. Deese began his first inmate

count of the J-1 building around 7:00 p.m. [*Id.* at ¶ 8]. Deese testified that at no point

during this inmate count did Deese speak with Plaintiff about any potential threats to

his safety. [*Id.* at ¶ 8]. Around 9:00 p.m., Deese conducted his second count of the J-1

building. [*Id.* at ¶ 9]. Like the first count, Plaintiff "gave no warning to [Deese], verbal or

otherwise, that he was in any danger from Morgan or that he feared for his safety in his

cell placement with Morgan." [*Id.*]. Deese didn't observe or hear of any assault by

Morgan on Plaintiff as it was occurring. [*Id.* at ¶ 11]. However, around 1:30 a.m., when

---

[32] The Court outlines Deese's and Weaver's affidavits for the sake of showing consistency between Plaintiff's account and Defendants'. It relies on Plaintiff's version to the extent there is a discrepancy.

[33] According to Plaintiff, Captain Lawson kept telling inmates on the night of the attack "that 80% of personnel was on vacation." [Doc. 33-3, Oliver Depo. I, p. 37:11–13].

Deese started his third count of the J-1 building, Plaintiff slid a note through his cell door to Deese "that said he had been raped by his cellmate, Morgan." [*Id.* at ¶ 10]. Deese then notified his supervisors, and prison staff moved other inmates around in order to place Plaintiff and Morgan in separate cells. [*Id.* at ¶ 12]. Deese "then secured the cell where [Plaintiff] and Morgan were housed, so that GDC investigators could collect any available evidence." [*Id.* at ¶ 14].

Like Deese, Officer Weaver was also present at WSP the night Morgan attacked Plaintiff. [Doc. 33-8, Weaver Aff., ¶ 4]. However, when Weaver reported for duty around 6:00 p.m. on the night of November 25, 2020, he conducted rounds on the J-2 building. [*Id.*]. That night, Weaver also assisted other officers "in making sure [they] had constant eyes on" two inmates on suicide watch, which "slowed [his] normal pace down to complete those rounds." [*Id.* at ¶ 7]. Weaver didn't know Morgan attacked Plaintiff until around 1:30 a.m. on November 26, 2020, when Deese told him about it.[34] [*Id.* at ¶¶ 8, 13]. He then notified his supervisor with Deese. [*Id.* at ¶ 10].

Back to Plaintiff's testimony. He testified that, "[b]efore the attack, [he] told Deese, there's something not right about this guy. He's on—on narcotics, drugs, and [he] needed to be moved out." [Doc. 33-4, Oliver Depo. II, p. 65:18–20]. Plaintiff points

---

[34] Plaintiff testified that Deese and Weaver would alternate 30-minute checks and sign the log sheets between the J-1 and J-2 buildings. [Doc. 33-4, Oliver Depo. II, p. 62]. Plaintiff also testified that when Deese looked in Plaintiff's cell and saw blood on the back of Plaintiff's pants, "[h]e called Lieutenant Brown, Lieutenant Bryant, and Sergeant Sullivan. And he brought Weaver from the other side because according to Lieutenant Brown, everybody was familiar with how violent Morgan is." [*Id.* at p. 62:18–24].

to these comments as providing Deese and Weaver with notice of the risk to Plaintiff's safety that Morgan posed. [*Id.* at p. 65].

On that point, Plaintiff's comments to Deese and Weaver sound like those the plaintiff in *Carter v. Galloway* made. 352 F.3d 1346, 1348 (11th Cir. 2003). There, the plaintiff "complained about [his cellmate] acting crazy, wanting to fake a hanging, and making a statement that Plaintiff would help in the fake hanging 'one way or another.'" *Id.* at 1349. However, the Eleventh Circuit held that these statements didn't "provide a sufficient basis to make the inferential leap that a substantial risk of serious harm to Plaintiff existed." *Id.* at 1350. The Circuit went on to say

> Defendants arguably should have placed Plaintiff elsewhere but "merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . ." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). Defendants only possessed an awareness of [Plaintiff's cellmate's] propensity for being a problematic inmate; to find Defendants sufficiently culpable would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court. Such a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement.

> *Id.*

Telling Defendants Deese and Weaver that he needed to be moved out or that his cellmate was using drugs is the epitome of making them aware of generalized, as opposed to individual-specific, risks. And, because Defendants at most knew of some potential general risks, they were not on notice of a specific risk individualized to Plaintiff.

34

Additionally, Plaintiff tries to make much of the fact that Deese and Weaver "were supposed to sign the hourly-log sheets, and they did not." [Doc. 33-4, Oliver Depo. II, p. 65:4–5]. Plaintiff also argues that if Deese and Weaver were at their desks, they would have heard him yelling for help. [*Id.* at p. 65]. Again, Plaintiff believes Deese "disappeared between 9:38 [p.m.] and 1:30 [a.m.]." [*Id.* at p. 61:22–24]. Even if Deese and Weaver falsified their signatures on their log sheets or were away from their desks, that would not be enough for Plaintiff to show deliberate indifference.[35] *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000) ("Failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence."); *Sanders v. Starling*, No. 21-12622, 2022 WL 6644768, at *3 (11th Cir. Oct. 11, 2022) ("In any event, shortcomings in the nurses' documentation or their adherence to protocol amount to a claim that they violated prison regulations, not the Eighth Amendment."); *Carter*, 352 F.3d at 1350; *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (affirming grant of summary judgment where jailer failed to make required rounds every 30 minutes and pretrial detainee was severely beaten).

Again, Plaintiff admitted that he did not communicate any threats to any Defendant before the assault. Although he potentially testified differently in his

---

[35] As to Plaintiff's transgender status, he testified that Deese and Weaver knew he was transgender because "they're assigned as the regulars for the second shift," and Plaintiff would tell them he didn't want to go to the showers without a shirt. [Doc. 33-4, Oliver Depo. II, pp. 66–67]. He also told them he "didn't consent to being searched by a man" the morning he reported the sexual assault. [*Id.* at p. 66:19–20]. On this latter point, telling Deese and Weaver that he was transgender after the assault cannot logically show that they knew he was transgender before the assault.

depositions, he cannot create a genuine issue of material fact by taking contradictory positions. The fact remains that he admitted he never communicated any threats to Deese and Weaver. And, Plaintiff offers nothing more to show that Defendants Deese and Weaver knew of a particular risk to his safety. His claims for deliberate indifference fail as to these Defendants as well.

### b.   _Plaintiff's General Allegations_

Plaintiff's statements that Defendants should have known he was in danger lack supporting evidence of prior rapes Morgan has committed, specific threats Morgan made towards Plaintiff that would make a risk to his safety evident, or any other evidence that would have led any of the named Defendants to know that Plaintiff's health, safety, or life was in danger. Plaintiff similarly asserts that Defendants should have known he was at a higher risk of facing danger simply because he said he was transgender. The Eleventh Circuit instructs that "the fact that [] officers deviated from policy or were unreasonable in their actions—even grossly so—does not relieve [the plaintiff] of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, 'Well, they should have known.'" _Goodman v. Kimbrough_, 718 F.3d 1325, 1334 (11th Cir. 2013).

In _Goodman_, the Eleventh Circuit explained that "[w]ere we to accept that theory of liability, the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made

abundantly clear it is not." *Goodman*, 718 F.3d at 1334. The Circuit also added that

"[a]lthough we view the evidence and draw all inferences in the light most favorable to

[the plaintiff], we cannot reasonably base an inference on mere supposition, and

nothing in this record creates a genuine issue of fact as to whether [the defendant

officers] were subjectively aware of a substantial risk of serious harm to [the plaintiff]."

*Id.*

That's the case here, and it's distinguishable from cases where the individual

defendants had a clear awareness of the specific danger of an inmate-on-inmate attack.

*See Caldwell*, 748 F.3d at 1101 (holding summary judgment inappropriate where

defendants knew of attacker's violent past, of specific "targeting" of the plaintiff, and

that plaintiff "feared for his life" when prison officials returned him to a cell with the

attacker). For example, in *Nelson v. CorrectHealth Muscogee, LLC*, the plaintiffs—the

deceased's surviving spouse and representative of his estate—survived summary

judgment on their deliberate indifference claims against a correctional officer and nurse.

No. 4:20-CV-213 (CDL), 2022 WL 17417983 (M.D. Ga. Dec. 5, 2022). There, "Nelson was

a pretrial detainee in the Muscogee County Jail when his cellmate, Jayvon Hatchett,

killed him." *Id.* at *1.

Citing *Rodriguez v. Secretary for the Department of Corrections*, 508 F.3d 611, 621–22

(11th Cir. 2007), the district court held that "[a] plaintiff can establish a substantial risk

of serious harm by showing that jail officers knew of a specific threat against an inmate.

But a specific threat is not necessary if there is enough other information to show a specific risk of serious harm." *Id.* at *5 (citations omitted). Despite there being no evidence that Hatchett made any specific threats of violence to anyone in the jail during his incarceration, the court held that "a reasonable jury could conclude that [defendants] both had enough information to infer that Hatchett posed a substantial risk of serious harm to white inmates because of the nature of his underlying crime." *Id.* at *6. That is, the officials knew that

> (1) Hatchett violently attacked [an] AutoZone clerk by stabbing him repeatedly; (2) Hatchett attacked the clerk without provocation, targeting him solely because he was white; (3) the only reason Hatchett stabbed the clerk was because he was white; (4) Hatchett's sole motivation for his attack of the clerk was his irrational response to the racially charged atmosphere connected to the widespread publicity of whites killing blacks. Despite this knowledge, neither [the correctional officer nor the nurse] passed the critical information to the Jail officials who were responsible for determining if Hatchett posed a safety risk to others.

> *Id.* at *6.

In other words, the district court held that even though the plaintiff didn't inform them of specific threats Hatchett had made, they knew Hatchett posed a risk but "decided to do nothing" about it. *Id.* That's not the case here. Plaintiff provides no evidence that any prison official knew of any prior sexual crimes Morgan had committed. It's also unclear whether Morgan had raped any other inmate during his

incarceration or anyone at all prior to his incarceration.[36] And although "a specific threat is not necessary" to survive summary judgment on a deliberate indifference claim, at least some "other information to show a specific risk of serious harm" is. *Id.* at *5. In other words, Plaintiff must present evidence to "support a reasonable jury's finding that [the prison officials] harbored a subjective awareness that [Plaintiff] was in serious danger." *Goodman*, 718 F.3d at 1332; *see also Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he *should have* perceived but did not . . . cannot under our cases be condemned as the infliction of punishment." (emphasis added)). Put simply, Plaintiff fails to present such evidence.

Eleventh Circuit precedent establishes that "officials must possess enough details about a threat to enable them to conclude that [the threat] presents a strong likelihood of injury, not a mere possibility." *Marbury*, 936 F.3d at 1236 (citations omitted). "The unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.*

---

[36] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the Georgia Department of Corrections website, which indicates that an "Anquavious Morgan" is not currently incarcerated. Find an Offender, Georgia Department of Corrections, https://gdc.ga.gov/GDC/Offender/Query (last visited May 19, 2023). However, an "Aquavious Laronn Morgan" is currently incarcerated for robbery by sudden snatch and false statements to the government at Telfair State Prison. *Id.* He served prior sentences for robbery and burglary. *Id.* This means either 1) that "Anquavious Morgan" is no longer incarcerated, or 2) that "Aquavious Morgan" is the correct spelling. The second seems more likely, especially given that Aquavious Morgan was convicted in Lowndes County, Georgia for each of his crimes, and Plaintiff testified that Morgan "said he was from the Valdosta area," "robbed some old lady," and "talked about killing a prosecutor from the Valdosta area." *Id.*; [Doc. 33-3, Oliver Depo. I, p. 38:10–15]. Valdosta is in Lowndes County. Assuming without deciding that "Aquavious Morgan" is the correct name of Plaintiff's attacker, Plaintiff fails to present information that would have put officials on notice of any specific risk of serious harm Morgan posed.

(citations omitted). Successful deliberate indifference claims will generally require some further reason—beyond a prisoner informing prison officials of the threat—that could permit prison officials to conclude that a particular threat evidenced a substantial threat, as opposed to the mere possibility, of serious harm. *Id.* In other words, the prisoner must communicate more than the generic problems of prison life to alert the prison official that something needs to change. And in the Eleventh Circuit, "more than a mere awareness of an inmate's generally problematic nature" is required to substantiate a claim for deliberate indifference. *Johnson v. Boyd*, 701 F. App'x 841, 845 (11th Cir. 2017) (citation omitted); *Carter*, 352 F.3d at 1350 (holding that there must be much more than mere awareness of an inmate's generally problematic nature).

As for the required "further reason" beyond informing officials of some threat that would lead them to conclude that a substantial threat of serious harm actually existed, Plaintiff didn't supply one. And "unless the [prison] official knows of and disregards an excessive risk to inmate health of safety[,]" that prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement." *Mosley*, 966 F.3d 1271 (citation omitted). Eighth Amendment case law requires that "the [prison] official must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and [that prison official] must also draw the inference." *Id.* (citing *Farmer*, 511 U.S. at 837). Indeed, the Eleventh Circuit held in *Rodriguez*, that where a "prisoner informed prison staff that members of

his former gang had threatened to kill him upon release into the general prison population," this information "was enough to place" the prison officials "on notice of a substantial risk of harm." *Marbury*, 936 F.3d at 1236–37 (11th Cir. 2019) (citing *Rodriguez*, 508 F.3d at 612–15, 621–22). However, "*Rodriguez* observed that a vague statement like 'I have a problem with another inmate in this compound,' absent some information 'about the nature of the anticipated risk,' would not have created a genuine issue of fact regarding deliberate indifference to a substantial risk of serious harm." *Id.* at 1237 (quoting *Rodriguez*, 508 F.3d at 619 n.15).

Vague statements—like telling prison officials about Morgan's nickname or that he didn't feel safe or comfortable in Morgan's cell—are precisely what Plaintiff told the prison officials. The Court once again returns to Plaintiff's admission that he never made any Defendant aware of any threats of violence made by Morgan to him at any point before the attack.[37]

Sure, the Court accepts as fact (because it is "sufficiently supported by" Plaintiff's deposition) that Plaintiff told WSP officials that he "needed to be removed from the cell" to "get away from [Morgan]." [Doc. 33-4, Oliver Depo. II, p. 58:2–9]. However, this does not affect Defendants' entitlement to summary judgment because

---

[37] Again, Plaintiff did not speak to any Defendant about any potential threat of violence Morgan made to him before officers moved him into a cell with Morgan. However, when attorney Jason Knowles asked Plaintiff in his deposition whether he reported that Morgan "kept insisting that he was going to" make Plaintiff join him in his cell or use marijuana with him, Plaintiff said he reported that to Officer Carruthers. [Doc. 33-3, Oliver Depo. I, p. 25:12–18]. Officer Carruthers is not a named Defendant in this case. In any event, Plaintiff did not even characterize that as a threat of violence. [*Id.* at p. 25:9–13].

he has failed to present evidence to "support a reasonable jury's finding that [Defendants] harbored a subjective awareness that [he] was in *serious* danger." *Marbury*, 936 F.3d at 1238 (emphasis added). At most, Plaintiff has sufficiently shown "*some* risk of harm," but that is insufficient for a deliberate indifference claim. *Id.* (citations omitted). The evidence in this case "would allow a jury to conclude that [Defendants and the other WSP officials were] put on notice that [Plaintiff] faced some unspecified risk of harm to his well-being—not that [they were] aware he faced the type of substantial risk of serious harm necessary to establish deliberate indifference." *Id.*

As the Eleventh Circuit Court of Appeals stated in *Marbury*, "[t]o allow" a deliberate indifference claim like Plaintiff's "to proceed absent sufficient evidence that . . . [D]efendants were subjectively aware that he faced a substantial risk of serious harm would elide the 'subtle distinction' between deliberate indifference and mere negligence." 936 F.3d at 1238 (citing *Goodman*, 718 F.3d at 1333–34). Based on the facts of this case, there simply isn't enough to show that Defendants *knew* that Plaintiff faced a substantial risk of serious harm. Accordingly, because Plaintiff cannot show that Defendants violated a constitutional right, Defendants are entitled to qualified immunity.

<u>**CONCLUSION**</u>

To be sure, no prisoner, including Plaintiff, should ever be raped or violently assaulted simply because they are in prison. And, the Court is well aware of the serious

allegations made against the Georgia Department of Corrections in various media reports and based on its own experience. The GDOC faces serious systemic issues that surely demand the immediate attention of the Governor, Attorney General, Georgia General Assembly, and potentially the United States Department of Justice. However, on this record, and after objectively and dispassionately applying the current binding precedent to the undisputed facts of this case, the Court can only find that the Defendants that Plaintiff chose to sue did not violate his Eighth Amendment rights.

Based on the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 33]. The Court **DIRECTS** the Clerk of Court to enter **JUDGMENT** accordingly.[38]

**SO ORDERED**, this 19th day of May, 2023.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[38] Plaintiff also claimed that Defendants violated "the Constitution and laws of the State of Georgia." [Doc. 1, ¶ 34]. Other than his bare-bones allegation that Defendants violated the Georgia Constitution, he never alleges any specific state-law violation. Initially, any claim based solely on the Georgia Constitution fails, as there is no equivalent to § 1983 under Georgia law. *See Howard v. Miller*, 476 S.E.2d 636, 639 (Ga. Ct. App. 1996) ("We have no equivalent to 42 U.S.C. § 1983, which gives a claim against a state officer individually for certain unconstitutional acts."). Nevertheless, "[t]he Georgia Constitution provides that state officers and employees 'may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.'" *Goodwin v. Crawford Cty.*, No. 5:18-cv-00030-TES, 2020 WL 873920, at *13 (M.D. Ga. Feb. 21, 2020) (quoting Ga. Const., art. 1, § 2, ¶ IX(d)). Thus, without demonstrating that Defendants acted with actual malice or with actual intent to cause injury while on the job, it is unlikely that Plaintiff would pierce Defendants' entitlement to official immunity. In any event, Plaintiff has abandoned his state-law claims because he never argued them in his Response [Doc. 36] to Defendants' Motion for Summary Judgment. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned, and affirming grant of summary judgment, as to claim presented in complaint but not raised in initial response to motion for summary judgment).